## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 11 2018, 10:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Termination of the Parent-Child Relationship of:

N.R., A.R., and M.R. (Minor Children)

and

J.B.,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

October 11, 2018

Court of Appeals Case No. 18A-JT-634

Appeal from the Jackson Superior Court

The Honorable Bruce A. MacTavish, Judge

Trial Court Cause Nos.
36D02-1709-JT-41
36D02-1709-JT-42
36D02-1709-JT-43

**Tavitas, Judge.**

# Case Summary

J.B. ("Mother") appeals the termination of her parental rights to N.R., A.R., and M.R. (the "Children"). We affirm.

# Issue

Mother raises one issue, which we restate as whether the evidence is sufficient to support the termination of her parental rights.

# Facts[1]

On April 24, 2015, Mother resided and worked in the Jackson County Econo-Lodge hotel. DCS received an allegation that Mother neglected the Children and abandoned the Children in the care of a stranger. The Jefferson County Department of Child Services ("DCS") removed the Children from Mother on an emergency basis due to allegations of neglect and abandonment.

The trial court conducted a detention hearing on April 27, 2015. That same day, DCS filed Child in Need of Services ("CHINS") petitions regarding the Children, and the trial court found that continued detention was in the Children's best interests. On July 15, 2015, the trial court adjudicated the Children as CHINS due to Mother's substance abuse and based on "Mother's

---

[1] The trial court also terminated the parental rights of the Children's father, L.R. L.R. is not a party to this appeal.

admission that the children were in need of services due to the instability, including housing instability, within the family[.]" App. Vol. II p. 92.

[5] Pursuant to the dispositional order, Mother was ordered to: (1) maintain safe and stable housing; (2) obtain legal and consistent employment; (3) refrain from illegal drug use; (4) undergo a substance abuse evaluation; (5) regularly submit to random drug screens; (6) address her substance abuse issues; and (7) participate in supervised visits with the Children. DCS referred Mother to home-based individual and family therapy for counseling aimed at addressing Mother's housing, employment, and parenting issues, for a substance abuse assessment, and for drug screening.

[6] Mother made minimal progress in complying with the dispositional order. Mother failed to secure and maintain steady housing; tested positive for various illegal substances; failed to maintain consistent employment; failed to regularly submit to drug testing; and failed to timely undergo a substance abuse evaluation, despite multiple referrals. Mother participated in supervised visitation; however, her participation was inconsistent.

[7] On September 7, 2017, DCS filed a petition to terminate Mother's parental relationship with the Children. On January 8, 2018, the trial court conducted a fact-finding hearing. At the time of the hearing, Mother was incarcerated on a failure to appear warrant stemming from an arrest for conversion.

[8] At the termination hearing, Mother testified that she was never homeless during the wardship and "always had somewhere to go"; and that she "stay[ed] with

friends" or lived with her husband's sister. Tr. Vol. II p. 11. Mother testified that, at the time of the fact-finding hearing, she and her husband were living in a newly-rented apartment and had resided there for three weeks. Mother also testified that she had two part-time jobs.

[9] Mother admitted that she failed some drug screens and tested positive for methamphetamine and cocaine during the proceedings. Mother also testified that she undertook personal and religious counseling, consulted with her physician, and eventually completed a substance abuse assessment in Indianapolis. According to Mother, her counselors advised that "[she] didn't need to do the drug assessment" and that she did not have a mental problem but, rather, she developed post-traumatic stress disorder, insomnia, and nightmares following the Children's removal. *Id*. at 16.

[10] Mother testified that she actively participated in supervised visitation, but cited transportation challenges, health issues, work schedule concerns, and incarceration as reasons for her missed occasional visits. Mother also testified that her PTSD and depression are under control; and that she "only started methamphetamines [ ] because [she] didn't have [her] kids" and "never did drugs before all of this[.]" *Id*. at 126. Mother testified further that she completed a substance abuse assessment shortly before the fact-finding hearing. Lastly, Mother testified that, notwithstanding her incarceration at the time of the fact-finding hearing, she and her husband had obtained housing and she was employed, such that she (or, to be precise, her husband) could take immediate custody of the Children.

[11] The State called DCS family case manager, Kayla Hardin, who testified as follows: at the time of removal, Mother lacked stable housing, was unemployed, and "test[ed] positive for illegal substances." *Id*. at 23. From April 2015 to September 2016, Mother failed to verify employment and failed to keep DCS apprised of her housing and employment status. Mother "would say that she was employed somewhere but would never provide verification of employment." *Id*. Hardin testified that Mother's housing instability did not improve during wardship and that, at best, Mother maintained an apartment for a two-month period in 2016, but was subsequently evicted following an April 2016 arrest.

[12] Hardin also testified that DCS was aware of Mother's significant transportation challenges and had advised Mother that "[t]he home-based case management [program] could have . . . address[ed]" Mother's transportation needs, but Mother did not fully avail herself of DCS's assistance. *Id*. at 37. Although "Mother did utilize some service[s]," Hardin testified that Mother's participation was inconsistent and that the case management service provider ultimately suspended Mother's services for noncompliance.

[13] Additionally, Hardin testified that Mother was referred for substance abuse assessments in March 2016 and January 2017. Mother was discharged for noncompliance by the service provider in June 2017. Mother was again referred for a substance abuse assessment in August 2017 and completed it in September 2017; however, Mother failed to comply with the service provider's resulting recommendations, as Hardin explained in the following testimony:

> [Mother] was recommended for addiction [ ] program group and treatment two to three-time weekly, individual counseling to address her PTSD weekly, case management to occur monthly, and medication management umm, and training about medication to occur quarterly. [Mother] was referred for the addiction program group on September 5th of 2017 and never participated.

*Id.* at 41-42. Hardin testified that, during the wardship, Mother submitted to approximately eight drug screens and failed six; and she tested positive for cocaine, tramadol, amphetamine, methamphetamine, oxycodone, and morphine.

[14] Further, Hardin testified that Mother participated in only forty-five minutes of individual therapy during the wardship and was discharged for noncompliance in June 2016, after Mother brought a knife to a supervised visit. Hardin added that Mother attended supervised visitation "about seventy-five percent of the time." *Id.* at 24. Lastly, Hardin testified that Mother simply "[di]d not ma[k]e any progress" toward achieving the case plan goals. *Id.*

[15] DCS family case manager, Victoria Fountain, testified that Mother gave DCS no reason to believe that Mother could remedy the conditions that resulted in the Children's removal; and that termination of the parent-child relationships between Mother and the Children was in the Children's best interests, stating:

> [Mother] has not been able to provide [the Children] with food, clothing, shelter based upon [her] lack of . . . income or proof of showing income, lack of housing . . . as well as the behavior that she has exhibited.

*Id*. at 49. Fountain testified that the Children "have really thrived having that stability in knowing that [they] are going to be cared for" in their foster placement, which is a "very loving" and "very structured" household with "set rules and consequences." *Id*. at 50. The foster parents plan to adopt the Children with DCS's full support.

[16] Linda Matthews, a home-based caseworker, visitation facilitator, and parenting instructor with Seeds of Life, testified that she worked with Mother toward reunification. Matthews testified that, although she was occasionally "encouraged" by Mother's efforts, Matthews discharged Mother due to Mother's inconsistency, failure to maintain regular contact, and unavailability.

[17] Court appointed special advocate ("CASA"), Julie Hirtzel, testified that she has served as the Children's CASA since June 2016 and visits the Children monthly. Hirtzel testified that she met Mother once during the wardship, received a phone number for Mother, but spent time "after that . . . pretty much just chasing [Mother] trying to find a good phone [number]."[2] *Id*. at 112. Hirtzel testified that the Children's foster placement experience is a far cry from the instability the Children experienced with Mother in that the Children are in "a very structured environment" in which the Children "know what is expected of them." *Id*. at 111. Hirtzel testified that, based upon DCS's reports, termination of Mother's parental rights is in the Children's best interests.

---

[2] Mother testified that she occasionally struggled to pay for cell phone minutes during the wardship.

[18]     Following the hearing, on January 31, 2018, the trial court terminated Mother's parental relationship with the Children and entered, in part, the following findings and conclusions of law:

> 15.     The Mother's testimony reveals that she has generally been unable or unwilling to secure suitable stable housing. For the vast majority of the more than two years and eight months since the children were detained, she has been unable to secure stable housing for herself for more than two or three months, and she has failed to ever secure housing that would be appropriate to allow her children to live with her.
>
> 16.     In her testimony, the Mother claims that she has now secured stable and suitable housing despite her being presently incarcerated. However, there was no evidence presented to support her testimony, and DCS was never presented with an opportunity to inspect the premises because the Mother failed to notify them of any change in her housing situation prior to the present hearing.
>
> 17.     The record establishes that the Mother has continued to abuse illegal substances for the duration of the underlying CHINS cases. DCS presented drug screens showing that the Mother tested positive for various illegal substances, including methamphetamine, cocaine, oxycodone, and morphine on 5/13/15, 7/15/15, 12/11/15, 3/4/16, 3/23/16, 8/16/17, and 10/4/17 . . . .
>
> 18.     The Mother has failed to substantially comply with the substance abuse services offered by DCS. She was ordered to complete a substance abuse assessment and follow any resulting recommendations for treatment through the Dispositional Decree, and she was initially referred for such an assessment on March 23, 2016. However, the Mother did not complete her

substance abuse assessment until September 5, 2017, and has failed to participate in any of the treatment and therapy that was recommended.

19.     The Mother has failed to secure and maintain a legal and stable source of income.  The Mother claims to have been employed at various times over the last two years, but has only provided verification of employment to either DCS or any of her service providers for only four weeks for the duration of the CHINS cases.

*****

9.     DCS has proven, by clear and convincing evidence, the following:

a)     The children were removed from the parents on April 24, 2015, and have remained continuously removed for more than 6 months since the Dispositional Decree was issued on August 5, 2015;

b)     The children have been removed from their parents and have been under the supervision of DCS for at least fifteen (15) of the most recent twenty-two (22) months, beginning on the date the children were first removed as a result of being alleged to be CHINS on April 24, 2015[;]

c)     There is a reasonable probability that the conditions that resulted in the children's removal and the reasons for placement outside the home of the parents — namely, the Mother's failure to secure and maintain stable and suitable housing; the Mother's failure to secure and maintain a legal and stable source of income; the Mother's substance

abuse issues; and the Father's inability or unwillingness to provide adequate care — will not be remedied;

> d)    Termination of the parent-child relationship is in the best interest of these children; and

> e)    The proposal made by DCS for the children to be adopted by the present foster placement is a satisfactory plan for the care and treatment of the children.

10.    Based on these Findings of Fact and Conclusions of Law, the Court is compelled by Ind. Code § 31-35-2-8 to terminate the parent-child relationship.

*Id*. at pp. 110-111, 112-113. Mother now appeals.

# Analysis

[19]    Mother challenges the termination of her parental relationship with the Children. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office*, 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling

to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs.'" *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[20] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re. I.A.,* 934 N.E.2d 1127, 1132 (Ind. Ct. App. 2010). We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)).

[21] Pursuant to Indiana Code Section 31-35-2-8(c), "The trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)."[3] Here, the trial court did enter findings of fact and conclusions of law in granting DCS's petition to terminate Mother's parental rights. When reviewing findings of fact and conclusions of law entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First,

---

[3] Indiana Code Sections 31-35-2-8(a) and (b), governing termination of a parent-child relationship involving a delinquent child or CHINS, provide as follows:

    (a) Except as provided in section 4.5(d) of this chapter, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.

    (b) If the court does not find that the allegations in the petition are true, the court shall dismiss the petition.

we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[22] Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B)  that one (1) of the following is true:
>
>> (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii)  The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)  that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).

[23] Mother concedes, in her argument regarding Indiana Code Section 31-35-2-4(b)(2), that DCS has established, by clear and convincing evidence, that: (1) there is a reasonable probability that the conditions that resulted in the Children's removal will not be remedied; and (2) DCS has a satisfactory plan for the Children's care and treatment. Mother, thus, only challenges the trial court's finding that termination of Mother's parental rights is in the Children's best interests.

[24] In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d at 267. In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *In re K.T.K.*, 989 N.E.2d at 1235. A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is a "central consideration" in determining the best interests of a child. *Id.*

[25] A parent's historical inability to provide a suitable, stable home environment along with the parent's current inability to do so supports a finding that termination is in the best interest of the child. *In re A.P.,* 981 N.E.2d 75, 82 (Ind. Ct. App. 2012). Testimony of the service providers and evidence that the conditions resulting in removal will not be remedied are sufficient to show, by clear and convincing evidence, that termination is in the child's best interests. *In re A.S.,* 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[26] DCS's involvement with the Children was prompted largely by Mother's housing and employment instability. During the pendency, Mother obtained housing, but was subsequently evicted following an arrest. Approximately three weeks before the fact-finding hearing, Mother and her husband claimed to have secured an apartment in which they had lived for three weeks. By the time of the fact-finding hearing, Mother was again incarcerated, but claimed that her part-time jobs were still available to her. Mother failed to take advantage of referred services and to avail herself of DCS's resources. Additionally, Mother failed to address her substance abuse issues and tested positive for various controlled substances during the proceedings. As a result, Mother failed to make any appreciable progress regarding DCS's case plan for reunification.

[27] The record supports the finding that Mother simply failed to demonstrate that she can provide permanency and a stable environment for the Children. By the time of the termination hearing, the Children had been removed from Mother's care for nearly three years, and Mother failed to make necessary adjustments to

remedy her housing and employment instability in order to provide the Children with a safe and healthy environment. The record establishes that, since their removal from Mother's care, the Children are thriving in a stable and loving home in the care of foster parents, both of whom can fully meet the Children's needs and intend to adopt the Children with DCS's full support. Lastly, DCS presented testimony from the DCS family case managers, Hardin and Fountain, and the CASA, Hirtzel, that termination of Mother's parental rights was in the Children's best interests. *See In re A.S.,* 17 N.E.3d at 1005 (holding that testimony of the service providers, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests).

[28] Based upon the totality of the evidence, we conclude that DCS provided clear and convincing evidence that termination of Mother's parental rights was in the Children's best interests. We cannot conclude that the trial court's finding is clearly erroneous.

## Conclusion

[29] The evidence is sufficient to support the termination of Mother's parental rights to the Children. We affirm.

[30] Affirmed.

[31] Brown, J., and Altice, J., concur.